OPINION OF THE COURT
Caesar D. Cirigliano, J.
Procedural History
On December 2, 2007, the defendant, Jose Molina, was arrested for driving while under the influence of alcohol. The defendant was charged with reckless endangerment (Penal Law § 120.20), reckless driving (Vehicle and Traffic Law § 1212), driving while intoxicated (Vehicle and Traffic Law § 1192 [3]), driving while intoxicated per se (Vehicle and Traffic Law § 1192 [2]) and driving while ability impaired by alcohol (Vehicle and Traffic Law § 1192 [1]). On January 28, 2009, a jury trial commenced before this court and concluded on January 29, 2009 with a verdict of guilty on the counts of reckless driving and driving while ability impaired by alcohol. The defense thereafter moved under CPL 330.30 to set aside said verdict. Therefore, pursuant to CPL 330.30 (1), this court is required to determine whether there are “[a]ny ground[s] appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court.”
Facts
The People offered the testimony of the arresting police officer, Edward Aiken, and the police officer who administered the Intoxicated Driver Testing Unit (IDTU) test,[1] Michael Sharpe.
On December 2, 2007, at approximately 9:45 p.m., Aiken, an officer of the Triborough Bridge and Tunnel Authority who was on that night assigned to the Bronx-Whitestone Bridge Toll Plaza, observed the defendant’s vehicle backing out of E-ZPass *364 lane 11 on the southbound plaza on the Bronx-Whitestone Bridge. Aiken testified that as the vehicle was backing out, Mr. Jose Molina ran over seven to eight stationary cones (transcript at 9, line 21) between E-ZPass lane 11 and cash lane 9. He also testified that defendant Molina nearly struck another vehicle that was approaching the toll plaza. Moreover, once the defendant backed out of lane 11 into lane 9 and started to drive forward, the vehicle swerved, coining about two inches from striking the island in said lane (transcript at 4, lines 22-25; at 5, lines 1-9). Officer Aiken then approached lane 9 and stopped the vehicle by stretching his hand in front of Mr. Molina and motioning him to stop.
Aiken then approached the driver’s side, the defendant rolled down his window and Officer Aiken, asked him whether he was okay. Mr. Molina did not answer. Aiken observed that the defendant was slumped back in his seat and had bloodshot, watery eyes (transcript at 12, lines 23, 24). Thereafter, Aiken asked the defendant where he was going and where he was coming from, to which the defendant answered his girlfriend’s house. As a result of a strong alcoholic beverage odor coming out of the defendant’s vehicle and the smell of alcohol on the defendant’s breath, Aiken asked Mr. Molina if he had been drinking. Initially, the defendant stated that he had not, but upon being asked again, he stated that he had three beers. Aiken noted that the defendant had a strong Spanish accent but could not make any determination whether or not the defendant’s speech was slurred. It must be noted that Aiken and the defendant communicated solely in English.
Upon making the above observations, Aiken then contacted his desk and one Lieutenant Ray responded. Aiken and Lieutenant Ray got the defendant out of the vehicle and attempted to administer a field sobriety coordination test. However, since it appeared to the officers that the defendant was unsteady on his feet, Lieutenant Ray decided to forgo the coordination test in the interest of the defendant’s safety. At this point, the defendant was placed under arrest for driving while intoxicated and was then transported to the 45th Precinct for the breathalyzer/ IDTU test.
At the 45th Precinct, Officer Sharpe, who administered the IDTU test, noted that the defendant had bloodshot, watery eyes, some slurred speech and a strong odor of alcoholic beverage on his breath (transcript at 48, lines 8-10). Sharpe testified that after the breathalyzer test, defendant’s reading was .164% *365 blood alcohol content, nearly double the legal limit. Furthermore, Sharpe testified and asserted that he did not submit the defendant to the physical coordination test[2] that ordinarily follows the breathalyzer test because there was a “language barrier” (transcript at 59, lines 4-8). However, the officer was able to describe to the defendant in English how to proceed to take the breathalyzer test. Sharpe unequivocally testified that when encountering a Spanish-speaking suspect he has never administered the physical coordination test due to language barriers (transcript at 83, lines 23-25). Specifically, Sharpe testified that the choice to give or not give the physical coordination test depends on whether there is a language barrier or if someone is so heavily intoxicated that they risk injuring themselves due to having difficulty standing (transcript at 80, lines 1-3).
Arguments
The defense argues that “the police department’s failure to administer a physical coordination test due to a language barrier, specifically, because the defendant spoke Spanish violated the defendant’s right to equal protection.” The defense relies on this court’s decision in People v Garcia-Cepero (22 Misc 3d 490 [2008]), to emphasize that “the procedure employed, that is affording both a breathalyzer and physical test to English-speaking individuals and only a breathalyzer to non-English-speaking defendants, not only differentiates between two classes but more importantly has no reasonable or rational basis and is inherently discriminatory against non-English-speaking individuals.” (Id. at 497.) Further, the defense argues that the defendant in this case was able to understand enough English to submit himself to a breathalyzer test and that Officer Sharpe’s decision to bypass the oft-given physical coordination test portion based upon the inability of the defendant to speak fluent English though he was able to understand it “stretches the evil of discrimination based on the inability to speak English to now encompass those individuals that have some ability but are summarily refused the opportunity because of an ethnically based, and therefore discriminatory, rationale.”
Moreover, on the issue of the violation of Mr. Molina’s due process rights, the defense argues that “the private interest af *366 fected by the official action is the guilt or innocence of the defendant accused of violation [of] [Vehicle and Traffic Law] § 1192 [(!)], a traffic infraction, with a possible sentence of up to fifteen days in jail and/or a fine along with a mandatory driver’s license suspension.” As to the risk of erroneous deprivation of such interest through the procedures used, defense argues that
“the results of the physical coordination test (as administered through a translator) can ameliorate the risk of erroneous deprivation through the display of the defendant’s condition under a police-controlled environment. With such evidence so close in time to the arrest, a fact-finder can better determine whether the prosecution has proven their case beyond a reasonable doubt.”
Finally, as to the government’s interest,
“[fit is submitted that the fiscal and administrative burdens that the additional or substitute procedural requirements would have entailed would have been minimal, namely, the use of a Spanish language interpreter, when compared with the defendant’s due process right to a fair opportunity to combat government accusations of criminal conduct.” (See Mathews v Eldridge, 424 US 319 [1976].)
On the other hand, the People argued as follows:
A. Preservation: “The defendant failed to timely preserve on appeal the issues of Equal Protection and Due Process violations . . . Therefore, this court is mandated by law to summarily deny defense motion on these issues as being untimely and therefore not preserved for the purpose of appeal.”
B. Legal Sufficiency: The People argue that the scope of CPL 330.30 is strictly limited to a determination that the trial evidence was not legally sufficient to establish the defendant’s guilt of an offense of which he was convicted; further, that the standard of determining legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt; further, that “[t]he interest of justice standard that defense would ask the trial judge to adopt in considering the Equal Protection and Due Process grounds is statutorily prescribed to intermediate appellate courts, not trial courts.” That is, that this trial court is strictly limited in its review to only that of legal sufficiency.
C. Equal Protection: The People argue that “[flor an Equal Protection violation argument to be raised by any party, not just *367 defense, a party must assert that a legislative enactment is discriminatory on its face or that a facially-neutral statute was enacted with discriminatory intent”; further, that the defense has failed to “set forth support . . . that Vehicle and Traffic Law § 1192(1) is administered with an uneven hand.” The People asserted that the method adopted by the New York City Police Department (NYPD) is rationally related to the purpose of avoiding confusion and complications due to any language barrier, as the police simply do not administer field sobriety tests to non-English-speaking defendants; further, that the fact that a defendant does not speak English does not make him a part of a “so called suspect class.”
D. Due Process I: The People assert that “all” non-English-speaking defendants are afforded the right to have use of an interpreter at a critical stage of the criminal process, the critical stage being the commencement of criminal actions against the defendant, and therefore, since the chemical or field sobriety tests are not critical stages, with the exception of the statutory requirement of refusal warnings, the police department is not required to provide the defendant with an interpreter.
E. Due Process II: The People request that if this court is so inclined to find a violation of the defendant’s due process rights, the court adhere to the balancing test enunciated in Mathews v Eldridge (supra). Specifically, the People argue:
1. Private Interest: The People assert that the private interest that would be affected by the official action, that is at the chemical testing stage, is the deprivation of liberty of a defendant without sufficient probable cause for the crimes charged and not, as the defense asserts, the potential of being able to put forth evidence of one’s defense at trial. Moreover, the People assert that the defense failed to set forth any statutory requirement of the NYPD to administer field sobriety tests on every defendant arrested on suspicion of driving while impaired, and that defendant has failed to cite to any requirements within the NYPD’s internal rules that require police to administer field sobriety tests on every defendant.
2. Risk of Erroneous Deprivation: The People argue that the risk to the defendant is minimal since the defendant was afforded an opportunity to submit to a chemical breath test, and the defendant availed himself of that opportunity.
3. Governmental Interest: The People strongly assert that the “paramount interest” is that of maintaining highway safety and that as a result of this “paramount interest,” the states are *368 granted “great leeway in adopting procedures to protect [the] public’s health and safety.” The People emphasize repeatedly that
“the creation of a procedural requirement mandating the police departments in the State of New York to afford a non-English speaking defendant with an interpreter for purposes of field sobriety test both at the scene of arrest and at the time of the chemical test would be prohibitively expensive and cumbersome, and would subvert the State’s compelling interest in promoting highway safety.”
The People proceeded to quote statistics regarding the number of drivers arrested in 2007, the number of languages and dialects involved, the cost of court interpreters, the unionized status of said court interpreters, the interpreters’ salaries according to grade, the ability of court interpreters to respond to arrest locations and the effect on the courts’ day-to-day operations, the time period (two hours) available for testing and finally, the immediate availability of a court interpreter — all of these purportedly burdensome upon the state and the courts.
F. Evidence: The People also contend that sufficient evidence was adduced at trial to satisfy the charge of Vehicle and Traffic Law § 1212.
G. Prosecutorial Misconduct: In response to the defense’s assertion of prosecutorial misconduct, the People contend that the defendant cites one limited incident within the People’s summation in support of their position that the defendant was deprived of his fundamental right to a fair trial which, in fact, does not amount to an “obdurate pattern of inflammatory remarks throughout their summation.” The People conclude that defendant has “failed to establish that the isolated statement by the People, when taken into consideration with the entire trial record, deprived the defendant of his right to a fair trial.”
Discussion and Decision
CPL 330.30 Standard: Preservation and Legal Sufficiency
Now, the People have argued in effect that this court does not have the authority to review the motion before it because “[t]he defendant failed to timely preserve on appeal the issues of Equal Protection and Due Process violations.” It must be noted that prior to the parties’ summation, this court entertained arguments by the defense and the People regarding the People’s burden of proof, but more specifically, the alleged violations of *369 the defendant’s equal protection and due process rights under the Constitutions of the United States and the State of New York. At the conclusion of said arguments, this court reserved decision. Therefore, it is this court’s opinion that the defense properly and timely preserved the issue of constitutional violations for review (see transcript at 4, lines 20-25; at 5-7).
In addition, the People argued that this court is constrained to only rule on legal sufficiency and that the issue of equal protection and due process rights violations can only be considered at the appellate level. Under CPL 330.30, this court has clear authority to review the constitutional issues preserved by the defense and to rule upon them. CPL 330.30 states that
“[a]t any time after rendition of a verdict of guilty and before sentence, the court may, upon motion of the defendant, set aside or modify the verdict or any part thereof upon the following grounds:
“1. Any ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court.”
In support of their contentions, the People cited two cases: People v Carter (63 NY2d 530 [1984]) and People v Carthrens (171 AD2d 387 [1991]). In Carter, the Court of Appeals reversed an order of the Appellate Division and denied the defendant’s motion to set aside the verdict, stating that
“a Trial Judge who has rendered a guilty verdict after a nonjury trial has neither inherent power nor statutory authority to reconsider his factual determination [and, although he may correct clerical or ministerial errors, he is without authority to reassess the facts and change a guilty verdict to not guilty.” (Carter at 533 [emphasis added].)
Clearly, Carter is distinguishable from the case at bar. In the instant case, the main issue does not involve a guilty or not guilty verdict, a nonjury trial or a reconsideration of the facts. Instead it involves the alleged violation of the defendant’s constitutional rights which if raised on an appeal would require a reversal or modification of the judgment as a matter of law.
The matter of People v Carthrens is also distinguishable from the case before this court because the main issue revolved around the trial court exceeding its power to review a jury verdict when it applied an “interest-of-justice” standard which is reserved for intermediate appellate court review.
*370 In People v Alfaro (66 NY2d 985 [1985]), a case which was distinguished from Carter, the Court of Appeals emphasized that CPL 330.30 provides that a court may set aside or modify the verdict on any ground which would require reversal or modification as a matter of law by an appellate court. It is this holding that this court adheres to.
The matter before this court involves an alleged violation of the equal protection and due process rights of an individual of Hispanic descent, when said individual by virtue of his origin and/or primary language (in this case Spanish) is treated differently than an individual whose primary language is English. Therefore, after reviewing the testimony, and after accepting the facts as viewed most favorably to the prosecution, this court finds a clear ground upon which a reversal would be required as a matter of law by an appellate court.
The main issue in this matter is whether the NYPD’s procedure of requiring only a videotaped breathalyzer test of primarily Spanish-speaking individuals of Hispanic origin and ethnicity, while requiring a videotaped breathalyzer and a physical coordination test of English-speaking individuals, violates the Equal Protection and Due Process Clauses of the United States Constitution and the New York State Constitution.
Equal Protection Clause
United States Constitution, Fourteenth Amendment, § 1 makes it clear that “[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws.” And article I, § 11 of the New York Constitution provides that “[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof.” Further, the passage of Civil Rights Law § 40-c expanded the coverage of article I, § 11 and such states:
“1. All persons within the jurisdiction of this state shall be entitled to the equal protection of the laws of this state or any subdivision thereof.
“2. No person shall, because of race, creed, color, national origin, sex, marital status ... or disability ... be subjected to any discrimination in his . . . civil rights ... by the state or any agency or subdivision of the state.”
More specifically, “ ‘[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State’s jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a stat-
*371 ute or by its improper execution through duly constituted agents.’ ” (Village of Willowbrook v Olech, 528 US 562, 564 [2000], quoting Sioux City Bridge Co. v Dakota County, 260 US 441, 445 [1989], quoting Sunday Lake Iron Co. v Township of Wakefield, 247 US 350, 352 [1918].)
Further, in Yellen v Baez (177 Misc 2d 332 [1997]), Judge Straniere held that
“[although language by itself does not identify members of a suspect or protected class . . . , it can be a basis of a finding of discrimination based on national origin when it creates a discriminatory result against all persons who do not speak English rather than persons of any particular nationality.” (Yellen at 336, citing Frontera v Sindell, 522 F2d 1215 [1975] and Carmona v Sheffield, 475 F2d 738 [1973].)
Clearly, the defendant in this case, a person of Hispanic origin whose primary language is Spanish, is a member of a protected class twice over.
Moreover,
“[t]here is a strong presumption as to the constitutionality of any legislative enactment, but this will not preclude a court from inquiring into the validity of such presumption.
“Although a statute may be nondiscriminatory on its face, it may be grossly discriminatory in its operation.” (People v Kennedy, 128 Misc 2d 937, 939 [1985] [citations omitted].)
The People’s response refers to my esteemed colleague’s decision in People v Burnet (24 Misc 3d 292 [2009]). In Burnet, the defendant argued “that the refusal warnings administered to the defendant were not clear and unequivocal” and in addition, that “even if the refusal warnings were given in ‘clear and unequivocal language,’ evidence of [defendant’s] refusal must nevertheless be suppressed because he did not understand them.” (Id. at 299.) The court, relying on the record, determined that the warnings were clear and unequivocal and the defendant’s refusal was persistent, all of which are not the issues before this court. However, the secondary issue addressed by my colleague does pertain to the issues before this court and is extremely instructive.
This court agrees with Burnet’s secondary holding that “[i]t is true that ‘[w]here governmental action disadvantages a suspect class or burdens a fundamental right, the conduct must be strictly scrutinized and will be upheld only if the government
*372 can establish a compelling justification for the action’ ” (Burnet at 300, citing Soberal-Perez v Heckler, 717 F2d 36, 41 [2d Cir 1983]). Moreover, “absent such a showing of discrimination or infringement on a fundamental right, a statute challenged as violative of the Equal Protection Clause may only be struck if it has no ‘rational basis.’ ” (Burnet at 300, citing Heller v Doe, 509 US 312, 319 [1993], Soberal-Perez, supra and Alevy v Downstate Med. Ctr. of State of NY., 39 NY2d 326, 332 [1976].)
In Burnet, the court was asked to determine whether non-English-speaking defendants constituted a “suspect class.” The court ruled that non-English-speaking defendants are not a suspect class and thus are not entitled to a strict scrutiny analysis. However, the court went on to state that
“[o]f course, that does not necessarily mean that such a classification can never be the basis of a finding of discrimination. Obviously, where it creates a discriminatory result against all persons who do not speak English, rather than persons of any particular nationality, strict scrutiny may very well be appropriate. For defendant to succeed on such a claim, however, he would need to demonstrate that the members of this so-called suspect class, non-English-speaking criminal defendants, have been the subject of discriminatory behavior based on race, nationality or ethnicity.” (Id. at 301.)
Assuming arguendo that this court accepts the People’s argument that Mr. Molina is not a member of a suspect class which was disadvantaged by a government action and that said action is not entitled to strict scrutiny (which we do not), the application of a rational basis test nevertheless under the facts of our case results in a clear constitutional violation. In Burnet, the court made two separate statements, one stating, “merely because, as counsel suggests, English-speaking defendants may be offered both chemical breath and physical coordination tests but non-English-speaking defendants are only offered a chemical breath analysis does not entitle him to strict scrutiny” and that
“[a]ll defendant has shown is that the non-English-speaking defendants are not offered the option of taking a physical coordination test so as to avoid confusion and complications due to any language barrier. And the method chosen here to achieve that result is indeed rationally related to that purpose, which is simply to avoid administering that particu *373 lar sobriety test.” (Id. at 300-301 [emphasis added].)
The court’s use of phrases such as “merely because, as counsel suggests” and “[a] 11 defendant has shown” clearly indicates that the facts established in Burnet are different from those presented before this court which we are called to decide.
An examination of the record before this court clearly indicates that there was no testimony or evidence submitted that the rational basis for the procedure of making two videotaped tests available to English-speaking individuals versus one videotaped test to Spanish-speaking individuals of Hispanic origin was to avoid “confusion and/or complications.”
In our case, Mr. Molina is an individual of Hispanic origin who speaks and understands English, albeit with a heavy accent. The testimony of Officer Sharpe is key in that he specifically stated that the reason he did not give a physical coordination test to Mr. Molina was solely because of a “language barrier.” (Transcript at 83, line 24.)[3] Moreover, the videotape of the procedure in the 45th Precinct clearly demonstrates a very controlled and orderly environment, devoid of any “confusion and/or complications.”
Therefore, unlike in Burnet, our facts clearly depict a defendant of Hispanic origin and ethnicity who was discriminated against because of an alleged language barrier and not because of a desire to avoid “confusion and/or complications.” Therefore, even under the rational basis test, the discriminatory procedure due to an actual language barrier or arbitrarily determined language barrier under the facts of our case had no rational basis and violated Mr. Molina’s constitutional rights. Regardless, it is this court’s opinion that Mr. Molina was a member of a suspect class and the procedure employed by the NYPD is subject to strict scrutiny analysis.
In 8200 Realty Corp. v Lindsay (27 NY2d 124,135-136 [1970]), the Court of Appeals held that “[t]he question of equal protection turns ultimately on the similarity or dissimilarity of rights differentiated by a statute; and the reasonableness of classification when different methods are used to affect different classes.” Although it is this court’s opinion that Vehicle and Traffic Law § 1192 (1) does not differentiate between an English- or *374 Spanish-speaking individual, the enforcement of the statute by the NYPD does.
It is this court’s firm belief that the procedure employed by the Police Department creates a classification predicated upon a person’s Hispanic origin and their inability to speak and/or understand the English language and therefore discriminates against primarily Spanish-speaking individuals of Hispanic origin.
Obviously, when a person does not speak or understand English, reasonable efforts must be made to ensure that the person’s rights are protected as English-speaking defendants’ rights are protected. In People v Niedzwiecki (127 Misc 2d 919 [1985]), the court found that a non-English-speaking defendant[4] must “reach a threshold point of understanding the choice presented to him, so he may at least be able to make a decision as to the course of conduct he will take.” (Id. at 921.)
Unfortunately, in the present case, even though Mr. Jose Molina was able to speak and understand English, albeit with a heavy accent, Officer Sharpe arbitrarily and hastily decided not to videotape and administer the physical coordination test. Moreover, no reasonable efforts were made to acquire a translator, whether it be a Spanish-speaking police officer, clerk or other employee from the 45th Precinct or any other police facility.
Based on all of the facts herein and a strict scrutiny analysis, this court finds that the procedure employed by the NYPD, that is, affording both a breathalyzer and physical coordination test to English-speaking individuals and only a breathalyzer to a Spanish-speaking defendant, not only differentiates between two classes but more importantly has no compelling justification for its application and is inherently discriminatory against non-English-speaking individuals of Hispanic origin and ethnicity.
It is even more insidious to deny the physical coordination test to this particular defendant, who could obviously understand and speak English, for the mere fact that Mr. Molina had a heavy accent and is of Hispanic origin coupled with a Hispanic surname. In this case, providing both types of tests, that is, breathalyzer and physical coordination, could not have been impeded by a language barrier because such did not exist. Moreover, had there been a true language barrier, the mere presence *375 of a Spanish interpreter in the form of a police officer, for example, who could have explained more fully the process of the physical coordination test, would have obviated the discriminatory procedure.
Procedural Due Process
Article I, § 6 of the New York State Constitution guarantees to all citizens the right not to be deprived of life, liberty or property without due process of law. (See also US Const, 14th Amend, § 1.)
In People v Torres, the court held that “[i]t is a well-established precept of due process that non-English speaking defendants in criminal actions are entitled to an interpreter.” (4 AD3d 624, 625 [2004], quoting People v Rodriguez, 221 AD2d 820, 821 [1995], lv denied 87 NY2d 924 [1996].) Moreover, “[i]t is a fundamental axiom of our system of jurisprudence that due process of law includes the right to have an adequate interpretation of the proceedings. This would apply to a litigant who does not speak sufficient English” (Yellen, 177 Misc 2d at 335).
The Supreme Court of the United States has created a three-part test to evaluate procedural due process issues:
“First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.” (Mathews v Eldridge, 424 US 319, 335 [1976].)
The People’s assertion that the defendant’s due process and equal protection rights are satisfied when a police officer establishes probable cause does not comport with this court’s understanding of the constitutional mandates of equal protection and due process. It is this court’s understanding that the constitutional rights of the accused remain with him from the inception of a criminal proceeding until its final disposition. Further, these rights depend neither on statutory requirements nor internal rules of the NYPD. However, these statutory requirements and internal rules must comport with equal protection and due process rights.
It is interesting to note that throughout the People’s response, the Assistant District Attorney constantly refers to “field tests” *376 which are generally administered at the scene and involve solely a breath test. (Vehicle and Traffic Law § 1194 [1] [b].) Nowhere in the defendant’s motion does the defendant assert a due process and equal protection argument in reference to “field tests.” The defendant does assert throughout his motion “that the police department’s failure to administer a physical coordination test due to a language barrier, specifically because the defendant spoke Spanish!,] violated the defendant’s right to Equal Protection.” Although there is a statutory obligation that defendants accused of driving while intoxicated must be advised that they have an obligation to submit to a breathalyzer test and the consequence of refusal, there is no corresponding statutory obligation to take the physical coordination test. However, there is an internal police procedure to subject an accused to a physical coordination test, which is arbitrarily performed depending on the primary language of the defendant. It is this procedure that distinguishes and deprives a primarily Spanish-speaking individual of necessary and potentially exculpatory evidence. (See Vehicle and Traffic Law § 1194 [2], [3].)
I. Private Interest
In following the United States Supreme Court’s analyses, it is obvious that the private interest that would be affected by the police department’s action or inaction are, for example, the guilt or innocence of the accused, deprivation of liberty, financial losses, impoundment of property, stigmatization in the community or place of work, and the privilege to drive an automobile.
II. Risk of Erroneous Deprivation As to the second part of the test, the “risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards” (424 US at 335), Mr. Molina was charged with reckless endangerment (Penal Law § 120.20), reckless driving (Vehicle and Traffic Law § 1212), driving while intoxicated (Vehicle and Traffic Law § 1192 [3]), driving while intoxicated per se (Vehicle and Traffic Law § 1192 [2]) and driving while ability impaired by alcohol (Vehicle and Traffic Law § 1192 [1]), all of which included prison time and/or a fine or suspension of driving privileges. This court finds that the deprivation of such interests by the procedures used has a direct relationship to the defendant’s freedom and privilege to drive. Further, the institu *377 tion of additional or substitute procedures would eliminate the deprivation of such interests.
III. Government’s Interest
Finally, the third part of the test concerns “the government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.” (424 US at 335.) Obviously, the government has a paramount interest and obligation in securing for all citizens the right to a fair trial and to ensure that the ends of justice are served: that the guilty be punished and the innocent be set free.
In this case, both the prosecution and the defense may have been better served if an interpreter would have been used. Indeed, if the defendant had an interpreter who explained the meaning of the choices, he very well may have chosen to take the physical coordination test. The videotapes of these tests and the results of the breathalyzer undoubtedly provide valuable objective evidence that will assist the District Attorney in evaluating the case and, therefore, in making the important decision whether to continue prosecution and ultimately will give the judge or jury an advantage of seeing how the defendant looked and acted both at the scene and within two hours of his arrest. In many cases, this evidence is crucial in determining the defendant’s guilt or innocence. Unfortunately, as Officer Sharpe testified, the physical coordination test is automatically excluded for Spanish-speaking defendants of Hispanic origin and ethnicity for reasons that do not show impracticality or impossibility, despite the People’s argument to the contrary, but only that the individual will not be able to understand the physical coordination instructions in English. Clearly, this is a distinction predicated merely on the ability of a defendant to speak and understand English, and in this court’s opinion such a distinction violates the Equal Protection and Due Process Clauses of the United States Constitution and is discriminatory.
There is nothing more fundamental than “[t]he right of an accused in a criminal trial to due process,” which is, in essence, “the right to a fair opportunity to defend against the State’s accusations.” (Chambers v Mississippi, 410 US 284, 294 [1973].) Few rights are more fundamental to due process than the right of an accused to present a complete defense. (US Const Amends VI, XIV; NY Const, art I, § 6; Crane v Kentucky, 476 US 683, 690 [1986]; Chambers at 302; Jenkins v McKeithen, 395 US 411
*378 [1969]; People v Husband, 135 AD2d 406, 411 [1st Dept 1987].) Thus, employing interpreters to aid in the explanation of the physical coordination component does not seem like an insurmountable burden especially when weighed against the defendant’s right to a fair trial, “opportunity to defend against the State’s accusations,” and access to potentially exculpatory evidence.
The People’s assertion that the government’s paramount interest in this case is to maintain safe highways is a concern that this court and all rational citizens share. However, this court is unable to understand how denying an accused his equal protection and due process rights and the possible conviction of a potentially innocent citizen advances the paramount interest of safety.
Further, this court has difficulty accepting the proposition that the only interpreter to be used is an official court interpreter with all the attending costs, union problems and procedural difficulties. The People’s view of who could be an interpreter is, to say the least, narrow. In this court’s opinion, there is a major distinction between the proficiency required of an official court interpreter to translate with precision the testimony of witnesses and court proceedings and the simple translation necessary to direct an accused to submit to a physical coordination test. Overall, reasonable efforts must be made in order to secure an individual, whether a police officer, precinct personnel, or even a court interpreter, if necessary, to translate the simple instructions of the physical coordination test. That is, for example, “touch your nose with your forefinger” (toque su nariz con su indice); “Walk in a straight line” (Camine en la linea derecha); or even “Raise your right leg” (levante su pierna derecha). Unlike the People’s argument, the court cannot conceive of this “doomsday” scenario where a simple translation would be incredibly costly. Moreover, financial concerns cannot be the paramount concern when weighed against the equal protection and due process rights of a citizen.
Conclusion
Therefore, the court finds that the procedure employed by the NYPD violated the defendant’s due process and equal protection rights and discriminated against a Spanish-speaking defendant of Hispanic origin and ethnicity. Thus, pursuant to CPL 330.30, this is clearly a ground which would require reversal of the judgment as a matter of law by an appellate court.
*379 As to the remaining issue of prosecutorial misconduct, this court holds that the defense “failed to establish that the isolated statement by the People, when taken into consideration with the entire trial record, deprived the defendant of his right to a fair trial.”
This court sets aside the verdict herein and therefore dismisses all the charges against the defendant.

. Breathalyzer test.

. Officer Aiken testified that the physical coordination test consists of horizontal gaze and nystagmus which involves the defendant following an object with his eyes, one-leg stand and counting to a prescribed number, and heel-to-toe walking back and forth (transcript at 31, lines 11-17).

. The same connotation or variation thereof was repeated by Officer Sharpe. (Transcript at 22, line 11; at 59, lines 4-11; at 61, lines 22-24; at 79, line 24; at 80, lines 1-4; at 84, line 24.)

. In Niedzwiecki the defendant was of Polish descent.